UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TIMBER PINES PLAZA, LLC,

    Plaintiff,

v.                                                              Case No: 8:15-cv-1821-T-17TBM

KINSALE INSURANCE COMPANY,

    Defendant.
_____

### ORDER DENYING KINSALE'S MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO STRIKE EVIDENCE IN OPPOSITION THERETO

This cause comes before the Court pursuant to *Kinsale's Renewed Motion for Summary Judgment and Incorporated Memorandum of Law* (Doc. No. 70) (the "**Summary Judgment Motion**") filed by the Defendant, Kinsale Insurance Company (the "**Defendant**" or "**Kinsale**"), and the *Plaintiff's Response to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law* (Doc. No. 75) (the "**Response**") filed by the Plaintiff, Timber Pines Plaza, LLC (the "**Plaintiff**" or "**Timber Pines**"). Also before the Court are motions to strike portions of the Response and other documents submitted in response to the Summary Judgment Motion (Doc. Nos. 77 and 80) (the "**Motions to Strike**") filed by the Defendant, and the responses in opposition thereto (Doc. Nos. 79 and 81) filed by the Plaintiff. For the reasons set forth below, the Summary Judgment Motion is **DENIED** and the Motions to Strike are **DENIED AS MOOT**.

**I.    Introduction**

The Court must decide whether genuine issues of material fact preclude summary judgment on the Plaintiff's claim that it suffered covered losses due to "sinkhole collapse," i.e. "the sudden sinking or collapse of land into underground empty spaces created by the

action of water on limestone or dolomite." Resolution of this issue turns on the meanings of the terms "sudden" and "land." As explained below, the term "sudden" contemplates an abrupt or sudden rate of collapse, while the tem "land" includes the soil, ground, and natural resources located below the earth's surface. Because the Defendant's record on summary judgment contains evidence of a sudden or abrupt collapse of soil, ground, and natural resources located below the earth's surface, a reasonable jury could find that the Plaintiff's losses are covered under the Policy's "sinkhole collapse" exception. For that reason, the Summary Judgment Motion must be denied.

II. **Background**

The Defendant is a surplus lines insurer that issued a Primary Property Policy No. 0100000677-0 (the "**Policy**") to Timber Pines effective September 9, 2010 through September 9, 2011. (Doc. No. 69, at ¶ 1). The Policy covered the premises located at 3023-3077 Commercial Way, in Spring Hill, Florida 34606 (the "**Property**"). (Doc. No. 69, at ¶ 2).

The Policy excludes from coverage, in pertinent part, "loss or damage caused directly or indirectly by . . . . Earth sinking (other than sinkhole collapse), rising or shifting soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty." (Doc. No. 69, at ¶ 4). Sinkhole collapse is defined as "the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite." (Doc. No. 69, at ¶ 6).

On March 23, 2011, the Plaintiff submitted a claim for damage to the Property purportedly caused by "a sinkhole." (Doc. No. 69, at ¶ 9). The Defendant conducted an investigation of the Plaintiff's claim and, after failing to discover any unusual conditions at the Property, advised the Plaintiff that it was denying the claim. (Doc. No. 69, at ¶¶ 10-

15). Between August 2012 and October 2012, the Defendant re-opened its investigation of the Plaintiff's claim and, after again failing to discover evidence of sinkhole damage, reaffirmed its estimation of a $0.00 loss. (Doc. No. 69, at ¶¶ 16-21).

Following the Defendant's second denial of the Plaintiff's claim, the Plaintiff demanded that the Defendant conduct additional sinkhole testing in accordance with Chapter 627 of the Florida Statutes. (Doc. No. 69, at ¶ 22). Despite believing it had no duty to comply with Chapter 627 of the Florida Statues on account of its status as a surplus lines carrier, the Defendant retained Halliwell Engineering Associates to perform a structural analysis of the Property. (Doc. No. 69, at ¶ 23). Halliwell Engineering Associates, in turn, hired Universal Engineering Sciences to perform additional geotechnical testing. (Doc. No. 69, at ¶ 23). That analysis and testing revealed that "sinkhole conditions" were present at the Property. (Doc. No. 69, at ¶ 33). Nevertheless, because the Defendant did not believe those "sinkhole conditions" met the definition of "sinkhole collapse" under the Policy, the Defendant continued to deny the Plaintiff's claim. (Doc. No. 69, at ¶ 36).

Approximately one year later, on April 15, 2014, the Plaintiff obtained a report from its own expert, George Sinn. (Doc. No. 69, at ¶ 33). Mr. Sinn's April 15, 2014 report states, among other things, that the Property is experiencing "very advanced sinkhole activity," and that "sinkhole activity is the predominant cause of the differential settlement being experienced" at the Property. (Doc. No. 68-16, at 4). In that report, Mr. Sinn takes issue with the Defendant's position that the "sinkhole activity" at the Property "<u>did not involve any sudden sinking or collapse of land</u>." (Doc. No. 68-16, at 3) (emphasis in original). According to Mr. Sinn, the Defendant's position is incorrect because

> [the Defendant fails] to understand the difference between a sinkhole and sinkhole activity as well as to understand the mechanism of soil raveling associated with sinkhole activity in causing a loss of bearing capacity within the supporting soils, the potential for *sudden disruption* of subsurface soil strata by sinking of soil layers (raveling) or even the *sudden collapse* of soils into solution channels which are empty spaces leading into the limestone

(Doc. No. 68-16, at 3) (emphasis added). Stated differently, it appears Mr. Sinn is of the opinion that the "sinkhole activity" or "sinkhole conditions" discovered by the Defendant's investigation are indicative of "sinkhole collapse" because "sinkhole activity" includes (or at least has the potential to include) the "sudden disruption of subsurface soil strata" and the "sudden collapse of soils."

Unable to reach an agreement on whether the "sinkhole activity" at the Property constituted "sinkhole collapse" under the Policy, the Plaintiff filed suit against the Defendant seeking coverage for damage caused by "sinkhole activity." (Doc. No. 69, at ¶ 40). The Defendant filed a series of motions to dismiss, and the Court ultimately construed the Policy's "sinkhole collapse" exception as requiring the Plaintiff to allege an "abrupt" or "sudden" rate of collapse. (Doc. No. 40, at 2) (the "**Second Dismissal Order**"). Because the Plaintiff had merely alleged losses "including, but not limited to, *progressive* physical settlement and cracking damage," the Court reasoned that the Plaintiff failed to state a claim for "sinkhole collapse." (Doc. No. 40, at 12) (emphasis in original). The Plaintiff has since filed a second amended complaint, alleging "sudden direct physical loss and damage to the Building." (Doc. No. 45, at ¶ 15).

On January 20, 2017, the Defendant filed the Summary Judgment Motion. In support, the Defendant attaches copies of Mr. Sinn's expert reports, copies of the deposition transcripts of Mr. Sinn and the Plaintiff's other expert witness, James Funderburk, along with copies of its own expert reports and deposition transcripts, which

it claims show there has been no "sinkhole collapse" at the Property as a matter of law. Specifically, the Defendant argues that the record lacks evidence of a "sudden" or "abrupt" collapse of "land" or "ground cover," such that the Plaintiff cannot recover under the Policy's "sinkhole collapse" exception.

The Plaintiff filed a response on February 13, 2017, addressing the legal issues raised in the Summary Judgment Motion. However, for some reason, the Plaintiff failed to file a "Statement of Disputed Facts," as required by the Court's Case Management and Scheduling Order, and omitted several attachments from its appendix of exhibits. *See* (Doc. No. 74, 75, 76, and 78). Consequently, the Defendant filed the Motions to Strike, seeking to exclude the untimely or otherwise unsupported materials from the record on summary judgment. Now that all briefing is complete, the Court is in a position to consider whether summary judgment is appropriate.

## III. Standard of Review

"Federal Rule of Civil Procedure 56 requires that summary judgment be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *U.S. Commodity Futures Trading Com'n v. Am. Derivatives Corp.*, 2008 WL 2571691, at *2 (N.D. Ga. June 23, 2008) (internal quotations omitted). "The moving party bears the initial responsibility of informing the court of the bases for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (internal quotations omitted). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and

5

present affirmative evidence to show that a genuine issue of material fact does exist." *Id.* "A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law." *Id.* "An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

## IV. Discussion

To recover under the "sinkhole collapse" exception, the Plaintiff must prove that it suffered losses caused by the "sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite." (Second Dismissal Order, at 2). "The court must enforce the insurance policy as written if the terms are unambiguous." *Kendall v. Genworth Life Ins. Co.*, 193 F.Supp.3d 1290, 1292 (M.D. Fla. 2016). "Whether a provision of an insurance policy is ambiguous is a question of law." *Id.* "If a word or phrase is not defined in the policy, then the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it." *Id.* "That is, when analyzing an insurance policy, a court gives words used in the policy their common, everyday meaning and interprets them as a reasonable person in the insured's position would have understood them." *Id.* (internal quotations omitted). "A term is ambiguous only if, applying the ordinary meaning, one would conclude the provision containing the term is reasonably susceptible to two or more constructions." *Id.* (internal quotations omitted). "To the extent the language of an insurance policy provision is ambiguous, all ambiguities must be resolved against the insurance company." *Id.* (internal quotations omitted).

## A. The term "sudden" requires the Plaintiff to prove its losses were caused by a "sudden" or "abrupt" rate of collapse.

The terms "sudden" and "land" are not defined in the Policy. Miriam-Webster's Dictionary defines the term "sudden" as: "1a: happening or coming unexpectedly," "1b: changing angle or character all at once," "2: marked by or manifesting abruptness or haste," or "3: made or brought about in a short time." *Sudden*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/sudden (last accessed April 21, 2017). A reasonable person in the Plaintiff's position would understand the term "sudden" according to its ordinary meaning, i.e. "unexpected," "abrupt," or "brought about in a short time." The ordinary meaning of the term "sudden" leaves no room for ambiguity. With all respect to the Fifth District Court of Appeal, a reasonable person in the Plaintiff's position could not possibly interpret the term "sudden" to mean a period of geologic time spanning hundreds or thousands of years. *See Zimmer v. Aetna Ins. Co.*, 383 So.2d 992, 994 (Fla. 5th DCA 1980) ("The time required for action of water on rock to create a void, when measured in terms of the earth's age may be a 'sudden' process but in terms of a man's lifetime, the progress of such process is hardly capably of discernment.").[1] Thus, consistent with the Second Dismissal Order, the Plaintiff must prove its losses were caused by a "sudden" or "abrupt" rate of collapse, as those terms are understood in common parlance.

---

[1] Aside from being cited by the Court in the Second Dismissal Order, the *Zimmer* case has never been cited by a state or federal case since it was decided in 1980. Given the significant evolution of Chapter 627 of the Florida Statues since *Zimmer* was decided, and given the case's lack of citing history, the Court does not believe that its construction of the term "sudden" adversely affects any reliance interests.

7

## B. The term "land" is ambiguous and, as a result, must be interpreted to include the soil, ground, and natural resources *below* the earth's surface.

Miriam-Webster's Dictionary defines "land," in pertinent part, as "1a: the solid part of the surface of the earth," "1b: ground or soil of a specified situation, nature, or quality," "1c: the surface of the earth and all its natural resources," or "2: a portion of the earth's solid surface distinguishable by boundaries or ownership." *Land*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/land (last accessed April 21, 2017). A reasonable person in the Plaintiff's position could understand the term "land" to mean either the "surface" of the earth, or the "ground," "soil," or "natural resources" located below the surface of the earth. Since a reasonable person could understand the term "land" to refer to areas located above or below ground --- or both --- the term is ambiguous. Since all ambiguities must be construed against the insurer, the Court is bound to construe the term "land" to include the soil, ground, and natural resources *below* the earth's surface.

On this point, the Court is aware that it previously drew a limited analogy between the terms "sinkhole collapse" and "catastrophic ground cover collapse." This analogy was predicated entirely on the common "temporal element" found in both terms. (Second Dismissal Order, at 11). The Court never held, as a matter of law, that the terms "sinkhole collapse" and "catastrophic ground cover collapse" were functionally equivalent. Importantly, the issue of whether the Policy's "sinkhole collapse" exception contemplated a "collapse of the ground cover," as distinguished from a collapse of "land," was not before the Court when it issued the Second Dismissal Order. Had that issue been before the Court, it would not have required the Plaintiff to prove a collapse of "ground cover," as distinguished from "land." Rather, the Court's references to "catastrophic ground cover

8

collapse" were intended only to emphasize that the Plaintiff could not state a claim for "sinkhole collapse" by merely alleging losses caused by "sinkhole activity," which unlike "catastrophic ground cover collapse" lacked a "sudden" or "abrupt" temporal element.

   C.  **The Defendant's record on summary judgment contains sufficient evidence of a "*sudden* sinking or collapse of *land*" that a reasonable jury could find for the Plaintiff.**

Having construed the disputed terms of the Policy, the Court must review the record for evidence of a "*sudden* sinking or collapse of *land.*" In Mr. Sinn's expert report dated April 15, 2014, Mr. Sinn opines that the Defendant's position that the "sinkhole activity" discovered at the Property did not involve any sudden sinking or collapse of land fails to understand "the mechanism of soil raveling associated with sinkhole activity . . ., the potential for *sudden* disruption of subsurface soil strata by sinking of soil layers (raveling) or even the *sudden* collapse of soils into solution channels which are empty spaces leading to the limestone." (Doc. No. 68-16, at 3) (emphasis added). In the following paragraph, Mr. Sinn opines that "this described subsurface soil movement [at the Property] is caused by the action of water on limestone with the result being to initiate settlement damage to the soil supported structure that is progressive with time." (Doc. No. 68-16, at 3). Mr. Sinn goes on to then opine the Property has experienced "very advanced sinkhole activity," and that "sinkhole activity is the predominant cause of the differential settlement being experienced by the subject buildings." (Doc. No. 68-16, at 4).

It is not entirely clear from the foregoing whether Mr. Sinn is of the opinion that the "sinkhole activity" at the Property involved the "*sudden* disruption of subsurface soil strata" or "the *sudden* collapse of soils into solution channels," or rather, whether there was merely a "*potential*" for such activity. Mr. Sinn's deposition does not provide any clarity on this point, as he was never directly asked whether the "sinkhole activity" at the Property

involved a "sudden" collapse. Instead, the Defendant focused its inquiry on whether the Property had experienced a "collapse," not whether any such collapse had been "sudden." *See, e.g.*, (Doc. No. 68-19, at 48:15-16) ("[T]here is evidence of damage due to soil collapse, in my opinion."). Given this imperfect record, the Defendant has not demonstrated the absence of a "*sudden* sinking or collapse of land." While not a model of clarity, Mr. Sinn's definition of "sinkhole activity" appears to contemplate the "*sudden* disruption of subsurface soil strata" and the "*sudden* collapse of soils into solution channels." In light of that definition, drawing all inferences in favor the Plaintiff, a reasonable jury could conclude that if Mr. Sinn testifies consistent with the opinions expressed in his April 15, 2014 report, the Property sustained damage caused by a "sudden" sinking or collapse.[2]

Turning next to whether the record contains evidence of a sudden sinking or collapse of "*land*," the primary issue here is a legal one, namely whether evidence of a collapse of sub-surface soil is sufficient to create an issue for the jury, or rather, whether the Plaintiff must prove a collapse of the surface or "ground cover." As noted previously, since the Plaintiff need only prove a collapse of the soil, ground, and natural resources *below* the earth's surface, the Court's analysis is relatively straightforward. The record contains ample evidence from which a reasonable jury could conclude there has been a

---

[2] This is not to say that proof of mere "sinkhole activity," as that term is defined in the Florida Statutes, will be sufficient to withstand a motion for directed verdict. As the Court went to great lengths to emphasize in the Second Dismissal Order, the Plaintiff must prove "sinkhole collapse" as defined in the Policy, not mere "sinkhole activity." Nevertheless, given that Mr. Sinn appears to define "sinkhole activity" to include some "sudden" disruption or collapse, a jury could infer that the temporal element of "sinkhole collapse" has been satisfied notwithstanding Mr. Sinn's imprecise use of the term "sinkhole activity."

collapse of "land." For instance, Mr. Sinn stated in his April 15, 2014 report that there has been "soil collapse" at the Property, which he again confirmed at his deposition. *See* (Doc. No. 68-16, at 5); (Doc. No. 68-19, at 48:14-16). Since the record contains evidence of a "*sudden* sinking or collapse of *land*" from which a reasonable jury could conclude the Plaintiff's damages were caused by "sinkhole collapse," the Defendant is not entitled to summary judgment.

### D. Notwithstanding the fact that genuine issues of material fact preclude summary judgment, many of the opinions expressed by Messrs. Sinn and Funderburk are likely inadmissible at trial.

Because Kinsale has not carried its burden of demonstrating the absence of a genuine issue of material fact, it is unnecessary for the Court to consider whether the affidavits signed by Messrs. Sinn and Funderburk should be stricken. Nevertheless, given that the Court anticipates many of these issues may arise again, the Court will provide the parties with guidance as they prepare for trial. With respect to matters raised regarding Mr. Sinn's affidavit, the Court has reviewed Mr. Sinn's three (3) expert reports, and can identify no prior disclosures in support of the opinions expressed in paragraphs 8, 9, 10, 11, 12, 13, and 15. Specifically, nothing in Mr. Sinn's expert reports discloses his intention to testify that the "sinkhole activity" affecting the Property is a "paleo-sinkhole," as distinguished from the other types of sinkholes identified in paragraphs 8 through 12 of Mr. Sinn's affidavit. To the extent Mr. Sinn expected to render such an opinion, he should have disclosed it in his expert reports.

As for the opinions expressed in Mr. Funderburk's affidavit, the Court shares the Defendant's concern that Mr. Funderburk's opinions are based on an erroneous understanding of the term "sinkhole collapse." In its Second Dismissal Order, the Court went to great lengths to clarify that the Plaintiff must prove losses sustained as a result of

a "sudden" or "abrupt" sinking or collapse. In so doing, the Court explicitly rejected the notion expressed in the *Zimmer* case that the term "sudden" should be defined according to its purported geologic meaning as spanning hundreds or thousands of years. Nevertheless, Mr. Funderburk appears to have based his opinions regarding "sinkhole collapse" on the supposed "geotechnical or geologic" definition of that term, rather than on the definition supplied by the Court in its Second Dismissal Order. *See* (Doc. No. 68-18, at 26:13-14). Having based his opinions on an erroneous definition of the term "sinkhole collapse," Mr. Funderburk's opinions may be untenable under Federal Rule of Evidence 702.

Lastly, it appears that Mr. Funderburk and Mr. Sinn, and to a lesser extent Mr. Randazzo, have attempted to opine on legal definitions of various terms contained in the Policy, such as "sinkhole collapse" and "land." This is not a proper form of expert testimony. Experts "may not attempt to instruct the jury on the law or any party's obligations under the law." *Chaney v. State Farm Mut. Auto. Ins. Co.*, 2015 WL 12838839, at *5 (M.D. Fla. Dec. 9, 2015). The Court must be the sole source of any law provided to the jury, including any legal definitions of terms contained in the Policy. The experts' role is to apply scientific, technical, or other specialized knowledge to assist the jury determine whether the Plaintiff's losses are covered based on the Court's construction of the Policy. Thus, neither party should expect to use expert testimony to construe the Policy in a manner inconsistent with this order or the Second Dismissal Order.

V.  **Conclusion**

Accordingly, it is

**Order in Case No. 8:15-cv-1821-T17-TBM**

**ORDERED** that the Summary Judgment Motion is **DENIED**, and the Motions to Strike are **DENIED AS MOOT** .

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this 21st day of April, 2017.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record